IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–02244–EWN–MEH


LOWER ARKANSAS VALLEY WATER
CONSERVANCY DISTRICT, a quasi-municipal
corporation and political subdivision of the State of
Colorado,

      Plaintiff,

v.

UNITED STATES OF AMERICA;
DIRK KEMPTHONE, Secretary of the Interior, in his
official capacity;
ROBERT W. JOHNSON, Commissioner, Bureau of
Reclamation, in his official capacity;
MICHAEL J. RYAN, Regional Director, Bureau of
Reclamation, in his official capacity; and
U.S. BUREAU OF RECLAMATION, a federal agency,

      Defendants, and

CITY OF AURORA

      Defendant-Intervenor.

_____

## ORDER AND MEMORANDUM OF DECISION
_____

Plaintiff Lower Arkansas Valley Water Conservancy District seeks declaratory and

injunctive relief in this action invalidating a contract between the United States of America and

the other above-captioned federal defendants (collectively the "United States") and Defendant-

Intervenor City of Aurora ("Aurora") permitting Aurora to store water in Pueblo Reservoir, a

facility of the Fryingpan-Arkansas ("Fry-Ark") Project. This matter comes before the court on

"United States of America's Motion to Dismiss" and "The City of Aurora's Motion to Dismiss,"

both filed on January 14, 2008. Jurisdiction is purportedly proper pursuant to the existence of a

federal question under 28 U.S.C. § 1331.

## FACTS

### 1.    *Factual Background*

In this action, Plaintiff seeks to invalidate a contract (the "Contract") between the United

States and Aurora (collectively "Defendants") permitting Aurora to store water in a facility of

the Fry-Ark Project on the grounds that the United States lacked statutory authority to enter into

this Contract, and the United States violated various environmental statutes and regulations in so

doing.  (*See generally* First Mot. to Amend Compl. for Declaratory and Inj. Relief [filed Mar. 24,

2008], Ex. 3 [Amend. Compl.] [hereinafter "Am. Compl."].)[1]  Defendants move to dismiss

Plaintiff's complaint for lack of constitutional and prudential standing, unreviewability of certain

claims, and failure to state certain claims.  (*See* Mem. in Supp. of United States of America's

Mot. to Dismiss [filed Jan. 14, 2008] [hereinafter "United States' Br."]; Mem. of Points and

Authorities in Supp. of City of Aurora's Mot. to Dismiss [filed Jan. 14, 2008] [hereinafter

_____

[1]All parties' briefing reflects the assumption that Plaintiff's proffered first amended
complaint is operative, but I note Magistrate Judge Michael E. Hegarty denied as moot
Plaintiff's motion to amend its complaint because leave of court was not required.  (*See* Minute
Order [filed Apr. 3, 2008].)  Nonetheless, because Plaintiff has not yet properly filed its first
amended complaint as directed by the magistrate judge, I again direct Plaintiff to properly file
this complaint.  (*See id.*)

"Aurora's Br."].)  The following facts relevant to Defendants' motions are taken from Plaintiff's first amended complaint and presumed true for the purposes of this motion.

### a. *Fry-Ark Project*

The Fry-Ark Project is a transmountain diversion project authorized by Congress for the purpose of diverting water from the Fryingpan River and other tributaries of the Roaring Fork River on the west side of the Continental Divide for use in the water-short Arkansas River basin on the east side of the Continental Divide.  (Am. Compl. ¶¶ 1, 29.)  More specifically, the Fry-Ark Project is a reservoir project planned, surveyed, and constructed by the Bureau of Reclamation ("Reclamation"), as authorized by the Reclamation Act of 1902 as amended, and the Fryingpan-Arkansas Authorization Act of 1962.  (*Id.* ¶¶ 2, 28.)  Federal Reclamation law, including the 1902 and 1962 Acts, govern the Secretary of the Interior's construction, operation, and maintenance of the Fry-Ark Project.  (*Id.* ¶ 28.)

There are five dams and reservoirs in the Fry-Ark Project.  (*Id.* ¶ 29.)  Ruedi Dam and Reservoir on the Fryingpan River is the only facility on the western slope; the other four facilities are on the eastern slope.  (*Id.*)  Sugar Loaf Dam and Turquoise Lake, Mt. Elbert Forebay Dam and Reservoir, and Twin Lakes Dam and Reservoir are all in the upper Arkansas River watershed.  (*Id.*)  Pueblo Dam and Reservoir, the largest facility in the project, is downstream from all the others on the Arkansas River.  (*Id.*)  Since the Fry-Ark Project first delivered water to the Arkansas River basin in 1975, it has delivered an average of about 55,000 acre-feet per year from the Colorado River basin to the Arkansas River basin for use by agricultural and municipal interests there.  (*Id.*)

The City of Aurora is not within the natural drainage basin of the Arkansas River, and is not within the area benefitted by the Fry-Ark Project.  (*Id.* ¶ 30.)

### b.    *Lower Arkansas Valley Water Conservancy District*

Plaintiff, created in 2002 by election, is a quasi-municipal corporation and political subdivision of the State of Colorado organized pursuant to the laws of the state.  (*Id.* ¶ 9.) Plaintiff encompasses Pueblo, Crowley, Otero, Prowers, and Bent counties, all of which are entirely within the natural drainage basin of the Arkansas River.  (*Id.* ¶¶ 9–10.)  Plaintiff was "established for the purposes of conservation of the water resources within the [boundaries of the Lower Arkansas Valley Water Conservancy District ("Lower District")], for their greatest beneficial use, and for other matters authorized under the Water Conservancy Act."  (*Id.* ¶ 10.) Plaintiff's mission is to "acquire, retain and conserve water flowing in the Arkansas River and its tributaries; to insure that all water will remain in the valley for the socio-economic benefit of the District citizens; and to participate in water-related projects that will embody thoughtful conservation, responsible growth, and beneficial water usage within the Lower Arkansas Valley."  (*Id.* ¶ 12.)  Plaintiff levies and collects property taxes from real property owners in the counties it encompasses on an annual basis.  (*Id.* ¶ 13.)

Plaintiff asserts standing in this matter based upon alleged injuries to both itself and its constituent water users, taxpayers, and inhabitants allegedly caused by the Contract.  (*See generally* Resp. to Mots. to Dismiss Filed by the Federal Defs. and the City of Aurora at 14, 20–24 [filed Mar. 24, 2008] [hereinafter "Pl.'s Resp."].)  I first describe Plaintiff's alleged direct and associational interests in Arkansas River and Fry-Ark Project water before discussing the

Contract and the alleged injuries Plaintiff claims flow therefrom.  As used throughout this order, "Arkansas River water" refers to all water in the Arkansas River regardless of source, "Fry-Ark Project water" refers to all water in the Arkansas River that is diverted from the western slope under the Fry-Ark Project, and "non-project water" refers to Arkansas River water that is native, non-Fry-Ark Project water.

       *i.*       ***Plaintiff's Direct Interests in Arkansas River and Fry-Ark Project Water***

Plaintiff has signed a letter of intent to lease water to the Pikes Peak Regional Water Authority ("PPRWA"), which is located outside the boundaries of the Southeastern Colorado Water Conservancy District ("SECWCD"), another water district relevant to the Contract and discussed below.  (*See id.* ¶ 16.)  Plaintiff is engaged in similar discussions with other water users who lie outside the boundaries of the SECWCD.  (*Id.*)  To lease water under these prospective agreements, Plaintiff will need to enter into storage and exchange contracts with the United States relating to the exchange and diversion of water within the reach of the Arkansas River from Turquoise Lake to Pueblo Reservoir.  (*Id.*)

Plaintiff also owns water rights, including shares in various ditch and canal companies, within the natural drainage basin of the Arkansas River, making it a beneficiary of the Fry-Ark Project eligible to receive Fry-Ark Project water.  (*Id.* ¶ 15.)  Plaintiff uses water from its decreed water rights and Fry-Ark Project water for irrigated agriculture and has continuously used Fry-Ark Project water since approximately 2004 for uses such as farming and ranching.  (*Id.*)  Some of Plaintiff's water rights are junior to Aurora's water rights in Arkansas River basin water.  (*Id.*)

### ii. *Plaintiff's Associational Interests in Arkansas River and Fry-Ark Project Water*

In addition to its direct interests in Arkansas River and Fry-Ark Project water, Plaintiff represents water users and other constituents, inhabitants, and taxpayers of the Lower District who are both beneficiaries of the Fry-Ark Project and users of Arkansas River water. (*See id.* ¶¶ 3, 15.) Such water users, constituents, inhabitants, and taxpayers realize economic, social, and environmental benefits from Fry-Ark Project and Arkansas River water, including: (1) agricultural and economic output from irrigated lands; (2) living in socially diverse rural agricultural communities; (3) enjoying the aesthetics of water flowing in the Arkansas River and the vegetation and wildlife along its banks; and (4) engaging in water-related recreational activities such as observing wildlife, hunting, and fishing. (*Id.* ¶ 15.)

Like Plaintiff, some of the Lower District's water users own water rights within the natural drainage basin of the Arkansas River, making them beneficiaries of the Fry-Ark Project eligible to receive Fry-Ark Project water. (*Id.* ¶ 15.) Some of these water users have continuously used Fry-Ark Project water since project deliveries began in 1972 and rely on such water for farming and ranching. (*Id.*) Moreover, some of these users' water rights are also junior to water rights Aurora owns in the Arkansas River basin. (*Id.*)

### c. *The Contract*

In September 2007, The United States and Aurora signed the Contract allowing Aurora to use Fry-Ark Project facilities to store and exchange Arkansas River basin water for export to the South Platte River basin. (*Id.* ¶ 4.) Aurora is located within the natural drainage basin of the

South Platte River, entirely outside of the boundaries of the natural drainage basin of the Arkansas River, and thus outside of the boundaries of the Fry-Ark Project or service area. (*Id.* ¶ 42.)

The Contract allows Aurora to store up to 10,000 acre-feet of non-project non-irrigation water annually in Pueblo Reservoir. (*Id.* ¶ 42.) Such stored water will come from water rights Aurora owns in the Lower Arkansas Valley. (*Id.* ¶ 47.) The Contract also allows Aurora to exchange its stored water at Pueblo Reservoir for Fry-Ark Project water stored in either Twin Lakes Reservoir or Turquoise Lake, both of which are upstream from Pueblo Reservoir. (*Id.* ¶ 41.) Following such exchanges, Aurora plans to release such water from Twin Lakes Reservoir and Turquoise Lake into the Arkansas River, and subsequently pump such water out of the Arkansas River basin and into the South Platte River basin for municipal, commercial, and industrial use in Aurora. (*Id.* ¶ 43.)

Under the Contract, the United States has the exclusive authority to determine if and when an exchange between Pueblo Reservoir and upstream Fry-Ark Project facilities will occur. (*Id.* ¶ 41.) Also under the Contract, Aurora's exchanges will have priority over similar exchanges by other entities entering into similar contracts with the United States in the future who plan to use their exchanged water outside the boundaries of the SECWCD. (*Id.*)

### d.   *Plaintiff's Alleged Injuries*

Plaintiff alleges the Contract will injure both its own direct and associational interests in Arkansas River and Fry-Ark Project water. (*See id.* ¶¶ 47–51.) I describe these alleged direct and

associational injuries in turn, again accepting as true the allegations in Plaintiff's amended complaint.

### i. *Injuries to Plaintiff's Direct Interests in Arkansas River and Fry-Ark Project Water*

The Contract will impair Plaintiff's ability to lease water to other entities such as the PPRWA, who will use the leased water within the natural drainage basin of the Arkansas River, but outside the boundaries of the SECWCD. (*See id.* ¶ 50.) Specifically, Plaintiff cannot lease water to such entities without first entering into its own storage and exchange contracts with the United States, and such contracts will be impaired by the provision in the Contract giving Aurora exchange priority. (*See id.*) The reduced exchange capacity of Fry-Ark Project facilities in light of Aurora's priority will have its greatest effect during and after droughts, when the lease values for water to be exchanged from the Lower District to Fry-Ark Project facilities upstream for use outside of the SECWCD is the greatest. (*Id.*)

Similarly, the entities to whom Plaintiff would lease water will face great uncertainty regarding the available exchange capacity in Fry-Ark Project facilities in light of the Contract, at least until Aurora informs the United States how much water it wishes to exchange each year. (*Id.* ¶ 51.) As a result of such uncertainty, such entities will be less likely to contract with Plaintiff. (*See id.*) Also as a result of such uncertainty, Plaintiff and other Lower District water users will not know whether to plant or fallow cropland because they will not know whether they will be able to deliver leased water. (*Id.*) The direct economic losses to such water users as a result of this uncertainty could exceed $15 million per year in post-drought years. (*Id.*)

### ii. *Injuries to Plaintiff's Associational Interests in Arkansas River and Fry-Ark Project Water*

The Contract will result in the exchange and export of approximately 14,000 more acre-feet of water per year out of the Arkansas River basin than would otherwise be possible. (*Id.* ¶ 47.) Without the Contract, Aurora would continue to use or let others use at least some of its Arkansas River basin water to irrigate land for agricultural production in the Lower District to avoid losing its water rights by abandonment. (*Id.* ¶ 48.) Alternatively, to the extent that Aurora would not so use or let others use its Arkansas River basin water, more water would be available to Lower District water users, including Plaintiff, whose water rights are junior to Aurora's water rights. (*Id.*) Such water would be particularly important in times of drought. (*Id.*)

The Contract will also facilitate the transfer of water from approximately 7,000 acres of historically irrigated land. (*Id.* ¶ 49.) The corresponding reduction in economic activity in the Lower District amounts to approximately $4.3 million per year. (*Id.*) Such lost economic activity will damage the Lower District and cause at least $85,000 per year in lost tax revenues affecting the Lower Arkansas Valley generally and Plaintiff specifically. (*Id.*)

## 2. *Procedural History*

On October 24, 2007, Plaintiff filed a complaint in this court against the United States, alleging that: (1) the United States lacked authority to enter into the Contract because this Contract was not authorized by the Reclamation Act of 1902, the Fryingpan-Arkansas Project Authorization Act of 1962, or any other law; (2) the Contract violated the Water Supply Act of 1958, which requires Congressional approval of modifications of reservoir projects to include

storage for municipal purposes when such modifications "would seriously affect the purposes for which the project was authorized . . . ;" (3) the United States failed to make necessary findings under the Reclamation Project Act of 1939 that the Contract was necessary and in the interests of the United States and the Fry-Ark Project before entering into the Contract; (4) the United States violated the National Environmental Policy Act ("NEPA") and other federal environmental statutes and regulations in entering into the Contract; and (5) the United States violated the provisions of an executive order in entering into the Contract. (Compl. for Declaratory and Injunctive Relief [filed Oct. 24, 2007].) Plaintiff sought declaratory and injunctive relief declaring the Contract void and enjoining its enforcement. (*Id*. at 20–21.)

On December 11, 2007, I granted Aurora's motion to intervene. (Order Granting the City of Aurora's Unopposed Mot. to Intervene [filed Dec. 11, 2007].) On January 14, 2008, the United States moved to dismiss Plaintiff's complaint on the grounds that: (1) Plaintiff lacked constitutional standing; (2) this court lacks subject matter jurisdiction over Plaintiff's third and fifth claims for relief; (3) Plaintiff lacks prudential standing under its first through fourth claims for relief; and (4) Plaintiff failed to state a claim under its second claim for relief. (United States' Br.) On January 14, 2008, Aurora separately moved to dismiss by: (1) incorporating the arguments in the United States' motion by reference; (2) providing additional argumentation on Plaintiff's standing; and (3) arguing that Plaintiff's fifth claim for relief was unreviewable. (Aurora's Br.) On March 24, 2007, Plaintiff both responded to Defendants' motions, and separately proffered an amended complaint which made minor stylistic and substantive changes, and subsumed Plaintiff's original fifth claim for relief into its fourth. (Pl.'s Resp.; Am. Compl.)

On April 25, 2008, both the United States and Aurora replied.  (Reply Mem. in Supp. of United

States of America's Mot. to Dismiss [filed Apr. 15, 2008] [hereinafter "United States' Reply"];

Aurora's Reply to Lower Arkansas Valley Water Conservancy District's Resp. to Mot. to Dismiss

[filed Apr. 25, 2008] [hereinafter "Aurora's Reply"].)  These matters are fully briefed and ripe for

review.

## ANALYSIS

### 1.    *Legal Standard*

#### a.    *Lack of Subject Matter Jurisdiction*

Federal Rule of Civil Procedure 12(b)(1) provides that a defendant may move to dismiss a

claim for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1) (2008).  As the Tenth

Circuit has explained:

> Rule 12(b)(1) motions generally take one of two forms.  The moving party may
> facially attack the complaint's allegations as to the existence of subject matter
> jurisdiction, or (2) go beyond allegations contained in the complaint by presenting
> evidence to challenge the factual basis upon which subject matter jurisdiction
> rests.

*Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (citation and

quotation marks omitted).  "It is the burden of the complainant to allege facts demonstrating the

appropriateness of invoking judicial resolution of the dispute."  *New Mexicans for Bill*

*Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (citation omitted).  In meeting this

burden, the plaintiff must support its claims of subject matter jurisdiction "in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 561 (1992). Thus, to establish constitutional standing at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court will] presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citation and internal quotation marks omitted). The court "must accept as true all material allegations in the complaint and must construe the complaint in favor of the complaining party." *Utah v. Babbitt*, 137 F.3d 1193, 1204 (10th Cir. 1998).

       *b.*        ***Failure to State a Claim***

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) (2008). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). Thus, all well-pleaded factual allegations in a complaint are accepted as true and construed in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

Prior to the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), dismissal of a complaint was appropriate only when it appeared the plaintiff could prove "no set of facts" in support of the claims that would entitle him to relief. *See, e.g.*, *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir. 1994). In *Bell Atlantic*, the Supreme Court articulated a new "plausibility" standard, under which a complaint must include "enough facts to state a claim to relief that is plausible on its face." 127 S. Ct. at 1974. *Bell Atlantic* did

not, however, mark a sea change. As the Court explained in a case decided two weeks after *Bell Atlantic*, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting *Bell Atlantic*, 127 S. Ct. at 1964); *see Alvarado*, 493 F.3d at 1215 n.2 (stating that *Bell Atlantic* and *Erickson* suggest "courts should look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief"); *see also Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (stating that courts must take as true "all plausible, non-conclusory, and non-speculative" facts alleged in a plaintiff's complaint).

## 2.    *Evaluation*

The United States and Aurora cumulatively move to dismiss Plaintiff's amended complaint on the grounds that: (1) Plaintiff lacks constitutional standing; (2) this court lacks subject matter jurisdiction over Plaintiff's third and fifth claims for relief because the statute and executive order upon which these claims rest are unreviewable;[2] (3) Plaintiff lacks prudential standing to assert its first through fourth claims for relief; and (4) Plaintiff failed to state a claim under its second claim for relief. (*See generally* United States' Br.; Aurora's Br.) I assess Plaintiff's constitutional standing first, and then discuss each defendant's specific arguments for dismissal of each of Plaintiff's claims.

_____

[2]As noted above, Plaintiff's original fifth claim for relief has been subsumed within its forth claim for relief in its proffered amended complaint. (*See* note 1, *supra*.)

### a.    Constitutional Standing

Article III of the Constitution grants federal court jurisdiction only over "cases" and "controversies."  U.S. CONST. art. III, § 2, cl. 1.  Standing is a component of the case or controversy requirement of Article III, and serves to ensure a plaintiff is the proper party to invoke judicial resolution of the dispute.  *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1223 (10th Cir. 2008).  To demonstrate Article III standing:

> First, the plaintiff must have suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (citing *Lujan*, 504 U.S. at 560–61).  Courts refer to these three requirements "as injury in fact, causation, and redressability."  *Id.* (citation omitted).  In the instant case, Defendants cumulatively argue that Plaintiff cannot establish any of these three requirements for any of its alleged direct or associational injuries.  I assess each of these requirements in the context of each of Plaintiff's alleged direct and associational injuries in turn.

### i.    Plaintiff's Alleged Direct Injuries

As detailed above, Plaintiff alleges that the Contract injures its direct interests in Arkansas River and Fry-Ark Project water.  Construing the allegations in its proffered amended complaint in the light most favorable to Plaintiff, it alleges that the Contract will impair its ability to lease water to other entities such as the PPRWA because it will first need to obtain its own storage and

exchange contracts with the United States, which will be impaired by the provisions of the Contract giving Aurora priority. (Am. Compl. ¶ 50.) Specifically, Plaintiff alleges that pursuant to the terms of the Contract, "Aurora's exchanges have priority over all other entities that use water outside the SECWCD who obtain excess capacity contracts in the future." (*Id.* ¶ 41.) As a result of both Aurora's priority, and the uncertainty surrounding the remaining exchange potential in Fry-Ark Project facilities (at least until after Aurora notifies the United States how much water it seeks to exchange each year), Plaintiff broadly asserts that entities such as the PPRWA will be less likely to contract with it. (*See id.* ¶ 51.) Plaintiff likewise alleges that uncertainty surrounding yearly exchange potential will cause it, and other Lower District water users, to lose money because they will not know whether to plant or fallow cropland until they know whether they will be able to deliver leased water. (*See id.*)

Defendants cumulatively argue that none of these alleged injuries satisfy any of the requirements for constitutional standing. (*See* United States' Br. at 13–14; Aurora's Br. at 7–9.) I analyze the sufficiency of these allegations under each of the three constitutional standing requirement in turn.

### (1) Injury in Fact

An "injury in fact" is an invasion of a legally protected interest that is: (1) concrete and particularized; and (2) actual or imminent. *Habecker*, 518 F.3d at 1223 (citation omitted). Although in a highly disorganized fashion, Defendants cumulatively argue that: (1) Plaintiff's purported interest in the storage and exchange potential of Fry-Ark Project facilities is not legally protected; (2) any injury to this interest is not particularized to Plaintiff; and (3) any injury to this

interest is not actual or imminent. (*See* United States' Br. at 13–14; Aurora's Br. at 7–9.) I address each contention in turn.

A. LEGALLY PROTECTED INTEREST — In a single sentence of its reply brief bereft of any analysis or legal citation, Aurora claims that "a prospective injury to a potential and unperfected future contract interest is not a legally protected interest." (Aurora's Reply at 17.) For the following reasons, I disagree.

The Tenth Circuit has acknowledged doctrinal uncertainty regarding what constitutes a "legally protected interest" for the purpose of standing analysis, but has noted that this requirement is likely identical to the requirement that there be a "legally cognizable interest." *See In re Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 [1997]). More specifically, the Tenth Circuit has noted the Supreme Court's repeated insistence that "a plaintiff can have standing despite losing on the merits — that is, even though the interest would not be protected by the law in that case." *Id.* (citations omitted). Accordingly, the Tenth Circuit has held that "an interest can support standing even if it is not protected by law (at least, not protected in the particular case at issue) so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention." *Id.*

In the instant case, I find Aurora's conclusory statement that "a prospective injury to a potential and unperfected future contract interest is not a legally protected interest" conflates the issue of whether Plaintiff's alleged impairment of its ability to lease water is sufficiently actual or imminent with the separate issue of whether its ability to lease water is a legally protected interest. With respect to this latter question, I find Plaintiff's ability to lease water is a "legally

cognizable interest" because it is the type of interest that would justify judicial intervention, whether or not Plaintiff ultimately prevails on the merits. *In re Grand Jury 89-2*, 450 F.3d at 1172.

B. PARTICULARIZED INJURY — The United States similarly argues in conclusory fashion that "[a]ny ultimate limitation on [Fry-Ark Project facility storage] space is a general impact applicable to everyone," and Plaintiff's concerns about the remaining exchange potential available through Fry-Ark Project facilities is "a general uncertainty that all entities face." (United States' Br. at 12, 19.) Although failing to cite any law in the relevant section of its brief, the United States appears to contend elsewhere that such allegedly generalized grievances contravene the standing requirement that "a plaintiff must allege some particularized injury that sets him apart from the man on the street." (*See id.* at 9 [quoting *Mountain States Legal Found. v. Castle*, 630 F.2d 754, 764 (10th Cir. 1980)].) For the following reasons, I again disagree.

The Supreme Court has held that the rule against asserting generalized grievances "invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature — for example, harm to 'common concern for obedience to law.'" *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998) (citations omitted). Conversely, the Court has held that "where a harm is concrete, though widely shared," it is proper to find an "injury in fact." *Id.* at 23 (observing that widespread injuries such as mass torts or interference with a large number of voters' voting rights constitute injuries in fact).

In the instant case, I find that Plaintiff objects to the Complaint on the basis of a concrete harm to its ability to lease water, not out of an abstract concern for United States' obedience to

law in entering into this Contract.  (*See* Am. Compl. ¶¶ 50–51.)  As such, I find this case readily distinguishable from the taxpayer and citizen standing cases in which the rule against asserting generalized grievances is commonly applied because the universe of potential plaintiffs alleging the same injury as Plaintiff — *i.e.*, Arkansas River water users with an interest in storing and exchanging water through Fry-Ark Project facilities — is significantly smaller than the universe of taxpayers or citizens.  This fact both belies the United States' assertion that Plaintiff's alleged injuries are shared by "everyone," and buttresses my previous conclusion that these injuries are sufficiently concrete and particularized.  *Cf., e.g.*, *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 545 U.S. 464 (1982) (finding plaintiff lacked standing to challenge a governmental transfer of property premised upon the theory that this transfer misused its members' taxpayer money).  Accordingly, I find Plaintiff's alleged harm is sufficiently particularlized to support jurisdiction even though this harm may be shared by other users of Arkansas River water.

    C.  Actual or Imminent Injury — "An injury in fact must be actual or imminent, not conjectural or hypothetical."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 (10th Cir. 2005) (citing *Lujan*, 504 U.S. at 560).  Allegations of possible future injury do not satisfy standing requirements, and a threatened injury must be "certainly impending" to constitute an injury in fact.  *Id.* (citation and internal quotation marks omitted).

    In the instant case, the United States argues in conclusory fashion that Plaintiff's alleged impairment of its ability to lease water is too conjectural, and Aurora argues slightly more concretely that this injury is too conjectural because it depends upon Plaintiff's execution of

future storage and exchange contracts with the United States that will allegedly be impaired by Aurora's priority. (United States' Br. at 13–14; Aurora's Br. at 8.) In addition, Aurora analogizes Plaintiff's alleged injury to the *Lujan* plaintiffs' alleged inability to see endangered wildlife in foreign countries following future, unplanned visits to these countries, which the Supreme Court found insufficiently imminent because, as the Court stated, "'some day' intentions — without any description of concrete plans, or indeed any specification of *when* some day will be — do not support a finding of [an] 'actual or imminent' injury." (*See* Aurora's Br. at 8 [quoting *Lujan*, 504 U.S. at 564 (emphasis in original)].) Finally, Aurora invokes the Supreme Court's observation in *Lujan* that imminence is less likely to be found where the alleged injury is to occur at some indefinite point in the future and "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." (*See id.* [quoting *Lujan*, 504 U.S. at 564 n.2].) As Aurora argues:

> [A]ny future impairment of Plaintiff's ability to deliver water to PPRWA would require it to execute a contract with PPRWA, disregarding the possibility that the already-existing Aurora Contract may complicate the delivery of water. Unless Plaintiff voluntarily executes a water contract that relies on excess Fry-Ark storage capacity, it cannot be injured.

(*Id.* at 14.) For the following reasons, I am not persuaded.

Despite both the United States' and Aurora's apparent contentions that Plaintiff's only alleged injury is its inability to perform on future contracts to lease water, I find that, at least viewed in the light most favorable to Plaintiff, the allegations in Plaintiff's amended complaint allege that Aurora's priority, and the uncertainty surrounding the remaining exchange potential of Fry-Ark Project facilities at least until after Aurora notifies the United States how much water it

seeks to exchange each year, will make entities such as the PPRWA less likely to contract with Plaintiff. (*See* Am. Compl. ¶ 51 [alleging that uncertainty of the entities of parties such as PPRWA "affects [Plaintiff's] ability to contract for the temporary use of irrigation water from the Lower Valley to users outside the SECWCD"].) Thus, while Aurora's priority might prevent Plaintiff from performing on future contracts, this priority, and the uncertainty regarding the remaining exchange potential of Fry-Ark Project facilities it engenders, might also lead to the non-formation of these contracts, or to their formation on less favorable terms. Accordingly, because Plaintiff alleges it has already signed a letter of intent to lease water to the PPRWA, and also alleges that it is engaged similar negotiations with other entities, I find that it has adequately alleged that its ability to lease water is presently impaired by the priority and uncertainty created by the Contract, and thus that its injury is "actual." (*Id.* ¶ 16.) The absurdity of any contrary holding is ironically highlighted by Aurora's own argument, which urges that to demonstrate an actual or imminent injury to its ability to lease water, Plaintiff must actually enter into a contract with the PPRWA which it may be unable to perform. (*See* Aurora's Br. at 14.) I find that this argument, premised upon an uncontextualized footnote in *Lujan*, disregards the factual dissimilarity between this case and *Lujan* because it presupposes that, absent an unperformable contract with the PPRWA, Plaintiff will not be injured. While such an analogous presupposition may have been true on the facts of *Lujan* — *i.e.*, absent a plane ticket to visit foreign lands, the *Lujan* plaintiffs were in no imminent danger of not seeing endangered wildlife there — it is not true of the facts of the instant case where the absence of a contract with the PPRWA could prove the very type of injury Plaintiff alleges flows from the Contract. Likewise, I also find that

Plaintiff's alleged injury is readily distinguishable from the conjectural "some day" injuries alleged by the plaintiffs in *Lujan* because Plaintiff alleges it is currently engaged in the very types of negotiations that are impaired by the Contract. *See Lujan*, 504 U.S. at 564; (Am. Compl. ¶ 16.) Accordingly, while I might agree with Defendants that Plaintiff's alleged inability to perform on future contracts might be too conjectural because it requires speculation about the incompatibility of non-existent contracts to lease water with non-existent storage and exchange contracts limited by Aurora's priority, I nonetheless find that Plaintiff has adequately alleged an "actual" injury by pointing to Aurora's priority, and to the uncertainty regarding the remaining exchange potential of Fry-Ark Project facilities this priority engenders.

### (2)    *Causation*

To demonstrate causation, a plaintiff must show that his injury is "fairly traceable" to the defendant's actions. *Habecker*, 518 F.3d at 1225 (citing *Lujan*, 504 U.S. at 560). Traceability need not rise to the level of proximate causation, but does require proof "of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Id.* (citation and internal quotation marks omitted). A plaintiff does not satisfy its burden of demonstrating causation where speculative inferences are required to connect its injury to the challenged action. *Id.* (citation omitted). "Moreover, where 'the independent action of some third party not before the court' — rather than that of the defendant — was the direct cause of the plaintiff's harm, causation may be lacking." *Id.* (citation omitted). "That an injury is indirect does not necessarily defeat standing, 'but it may make it substantially more difficult . . . to establish that, in fact, the asserted injury was the consequence of the defendants' actions." *Id.* (citation omitted).

In the instant case, the United States claims that the alleged impairment of Plaintiff's ability to lease water is not traceable to the Contract because "exchanges are a matter of state water law," and "[t]he availability of exchange potential is the result of independent actions of a number of water users in the basin." (United States' Br. at 13.) Although the United States does not meaningfully explain these arguments, it appears to contend that any reduction in the remaining exchange potential of Fry-Ark Project facilities purportedly caused by the Contract is actually caused by the adjudications of state water courts, which must sanction "physical exchanges" of water, *i.e.*, diversions of water out of priority in one location and replacements at another location.[3] Similarly, the United States appears to argue that because the exchange potential of Fry-Ark Project facilities is dependant upon myriad factors, including the independent decisions of other water users, any reduction allegedly caused by the Contract cannot be the sole source of the Plaintiff's claimed injury.

I find that the United States' arguments — at least to the extent that I properly understand them — are alternatively misdirected and irrelevant. The United States' apparent contention that causation between its actions and Plaintiff's alleged injury is lacking because physical exchanges must be adjudicated by state water courts ignores the unambiguous allegation in Plaintiff's amended complaint — buttressed by two state water court decrees Plaintiff proffers in its

---

[3]The United States admits in its reply that state water court adjudications are not required for "contract exchanges," which essentially involve the "trading" of water between reservoirs. (*See* United States' Reply at 9.) Because, construed in the light most favorable to Plaintiff, the complaint alleges that Plaintiff's injuries relate to *all* "exchanges" between Fry-Ark Project facilities, I find that this admission alone defeats the United States' argument on this score. (*See* Am. Compl. ¶ 50.)

response brief that require Aurora to enter into storage and exchange contracts with the United States prior to executing the physical exchanges between Fry-Ark Project facilities adjudicated in these decrees — that the Contract is at least a "but for" cause of Aurora's ability to exchange water between Fry-Ark Project facilities. (*See* Am. Compl. ¶ 47 [alleging that "[t]he Aurora Contract is *required* for Aurora to use excess storage capacity and to facilitate exchanges" (emphasis added)]; Pl.'s Resp. at 16–18, Ex. 4 [2004 Decree], Ex. 6 [1994 Decree].) In other words, Plaintiff adequately alleges that, but for the Contract, Aurora would not be able to execute the physical exchanges between Fry-Ark Project facilities adjudicated in state water court decrees. Accordingly, Aurora adequately alleges — at least at this stage of the litigation — that the Contract "caused" its injuries in the sense that this Contract is a necessary, if not sufficient, cause of the impairment of its ability to lease water. *See Habecker*, 518 F.3d at 1225 (stating that traceability requires only proof "of a substantial likelihood that the defendant's conduct caused the plaintiff's injury in fact"); *Lujan*, 504 U.S. at 561 (noting that, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice"). Similarly, I find that the United States' apparent contention that the exchange potential of Fry-Ark Project facilities is dependant upon many factors is irrelevant to the question of causation between Defendants' actions and Plaintiff's alleged injury because Plaintiff's injury derives from Aurora's exchange priority and the uncertainty regarding the remaining exchange potential of Fry-Ark Project facilities this priority engenders, and not from the absolute exchange potential of Fry-Ark Project facilities. (*See* Am. Compl. ¶¶ 50–51.) Accordingly, the myriad factors that may or may

not determine the absolute exchange potential of Fry-Ark Project facilities are simply irrelevant to causation between Defendants' actions and Plaintiff's injury.

### *(3)* *Redressability*

The redressability requirement of standing "requires that the plaintiff demonstrate a substantial likelihood that the relief requested will redress its injury in fact." *Nova Health Sys.*, 416 F.3d at 1158 (citation omitted). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *Id.* (citation omitted). In many cases, "'redressability and traceability overlap as two sides of a causation coin.'" *Id.* (citation omitted).

In the instant case, I find that causation and redressability overlap because a declaratory judgment invalidating the Contract would redress Plaintiff's alleged injury, *i.e.*, the impairment of its ability to lease water in the face of Aurora's priority and in light of the uncertainty regarding the remaining exchange potential of Fry-Ark Project facilities this priority engenders. *Id.*, 416 F.3d at 1158 (citation omitted).

### *ii.* *Plaintiff's Alleged Associational Injuries*

As detailed above, Plaintiff also alleges the Contract injures its associational interests in Arkansas River and Fry-Ark Project water. Specifically, Plaintiff alleges that the Contract will result in the additional exchange and export of about 14,000 acre-feet of water per year out of the Arkansas River basin than would otherwise be possible. (*Id.* ¶ 47.) Plaintiff claims that, without the Contract, Aurora would continue using or letting others use at least some of its Arkansas River basin water to irrigate land for agricultural production in the Lower District to avoid losing

its water rights by abandonment.  (*Id.* ¶ 48.)  Alternatively, Plaintiff asserts that, to the extent Aurora would not so use or let others use its Arkansas River basin water, more water would be available to Lower District water users, including Plaintiff, whose water rights are junior to Aurora's water rights.  (*Id.*)  Plaintiff also claims that the Contract will facilitate the transfer of water away from historically irrigated lands, with a resultant reduction in economic activity in the Lower Valley and a decrease in tax revenue to Plaintiff and other entities.  (*Id.* ¶ 49.)

Defendants argue that the net export of Aurora's water out of the Arkansas River basin, and the alleged consequent reduction in economic activity and diminution of the tax base potential of the Lower District, does not satisfy any of the requirements for constitutional standing.  (*See* United States' Br. at 11–12; Aurora's Reply at 3–4, 11–14.)  I assess the sufficiency of this alleged injury under each of the requirements for standing in turn.

### *(1)* *Injury in Fact*

The United States and Aurora argue that the net export of Aurora's water out of the Arkansas River basin, and the consequent reduction in economic activity and tax base potential of the Lower District, is not an "injury in fact" because: (1) Plaintiff's and its constituent water users' ability to use Aurora's water is not a legally protected interest; (2) the alleged injury to Plaintiff and its constituent water users is not sufficiently particularized; and (3) any harm to Plaintiff's and its constituent water users' interests is not actual or imminent.  (*See* United States' Br. at 11–12; Aurora's Reply at 3–4, 11–14.)  I assess each contention in turn.

A. LEGALLY PROTECTED INTEREST — Aurora argues that Plaintiff's and its constituent water users' ability to use Aurora's water in the Lower District is not a legally protected interest

because the ability to use this water requires that Aurora first fail to exercise its own senior water rights in priority, and that the loss of any "windfall" to Plaintiff is not "an injury recognizable at law." (Aurora's Reply at 11.) More specifically, Aurora argues that "[b]y definition, the nature of [Plaintiff's] interest in its water rights is limited by Aurora's senior right to appropriate." (*Id.*) For the following reasons, I find that Aurora's argument misstates the nature of Plaintiff's alleged legally protected interest, and is thus unpersuasive.

Aurora's argument presupposes that Plaintiff's and its constituent water users' only alleged legally protected interest is their right to use Aurora's water. (*See id.*) I disagree. Read in the light most favorable to Plaintiff, the allegations in its amended complaint allege that the net export of Aurora's water out of the Arkansas River basin will injure its own and its constituent water users' interests by removing water from historically irrigated acreage, causing a decrease in economic activity in the Lower District and a diminution of the tax base potential of this district. (*See* Am. Compl. ¶ 49.) Plaintiff's amended complaint also alleges that such injuries might be avoided through one of two causal chains if the Contract is voided. (*See id.* ¶ 49.) First, Plaintiff claims that, in the absence of the Contract, Aurora may "continue to use or let others use . . . its . . . water to irrigate land for agricultural production in the [Lower District] to avoid losing these water rights through abandonment." (*Id.* ¶ 48.) Alternatively, Plaintiff asserts that, to the extent Aurora will not so use or let others use its water after voiding of the Contract, "more water would be available for use by other junior water right owners, including Plaintiff, . . . for economic activities such as irrigation and other purposes." (*Id.* ¶ 48.)

Given this reading of Plaintiff's amended complaint, I find Aurora's argument unpersuasive because it misstates the nature of Plaintiff's alleged legally protected interest. Contrary to Aurora's representation, Plaintiff does not allege a bare interest in using Aurora's senior water rights, but rather in preventing a decrease in the economic activity and tax base potential of the Lower District caused by the export of Aurora's water. As such, I find Plaintiff's amended complaint relates a "legally cognizable interest" because Plaintiff's interest in preventing economic injury to itself and its constituent members is "of sufficient moment to justify judicial intervention." *In re Grand Jury 89-2*, 450 F.3d at 1172.

B. PARTICULARIZED INJURY — Defendants next argue in largely cursory fashion that Plaintiff's alleged associational injury relating to the export of water out of the Arkansas River basin is not sufficiently particularized because, as Aurora argues, this injury is "a general injury to the public at large in the affected region." (Aurora's Reply at 13; United States' Reply at 9.) I disagree. As noted above, the rule against asserting generalized grievances applies only where "the harm at issue is not only widely shared, but is also of an abstract and indefinite nature — for example, harm to 'common concern for obedience to law.'" *Akins*, 524 U.S. at 23. In the instant case, Plaintiff's alleged harm traceable to the net export of water out of the Arkansas River basin is the impairment of economic activity in the Lower District and a diminution of the tax base potential of this district caused by the dry-up of historically irrigated acreage. (*See* Am. Compl. ¶ 49.) I find this alleged harm, while widely shared, is sufficiently "concrete" to avoid contravening the rule against asserting generalized grievances.

C. ACTUAL OR IMMINENT INJURY — Defendants additionally contend that Plaintiff's alleged injuries are not sufficiently actual or imminent but fail to adequately explain why this so. (United States' Br. at 17–18; Aurora's Reply at 7–8.) I find that Plaintiff's alleged injuries are sufficiently actual or imminent because the Contract was executed in September 2007, and the first of the yearly exchanges it contemplates has therefore likely already occurred, or is imminent as of the date of this order. (*See* Am. Compl. ¶ 39.)

### *(2)* *Causation*

Attacking the causal connection between the Contract and Plaintiff's alleged injuries, both the United State and Aurora suggest that most, if not all, of Aurora's water rights in the Arkansas River basin have already been taken out of agricultural use pursuant to state water court decrees, and that Plaintiff's alleged economic injuries resulting from the export of water out of Arkansas River basin are actually traceable to these state water court adjudications. (*See, e.g.*, Aurora's Reply at 8.) Despite so suggesting, Defendants proffer no evidence demonstrating the extent to which Aurora's rights have already been taken out of agricultural use, and the United States acknowledges that such "dry-up" of acreage was at least not complete as of the date of execution of the Contract. (*See* United States' Br. at 12 [asserting that "*nearly* all of the [dry-up] of acreage occurred prior to the complained of action" (emphasis added)].)

I find that Plaintiff has adequately alleged a causal connection between the Contract and the export of water out of the Arkansas River basin because, as discussed above, it has adequately alleged that the Contract is a "but for" cause of this export. (*See* Am. Compl. ¶ 47 [alleging that "[t]he Aurora Contract is *required* for Aurora to use excess storage capacity and to facilitate

exchanges" (emphasis added)].)  Moreover, despite the parties' apparent disagreement regarding the degree to which Aurora's water rights may already have been taken out of agricultural use by the date of the Contract's execution, I find Plaintiff has adequately alleged that such "dry-up" was at least not complete as of this date.  (*See id.* ¶ 48 [alleging that, absent the Contract, "Aurora would *continue* to use or let others use . . . its . . . water to irrigate land for agricultural production" (emphasis added)].)  Accordingly, I find Plaintiff has adequately established, at least at this stage of the litigation, that its injury is "fairly traceable" to the Contract.  *Habecker*, 518 F.3d at 1225.

### (3)    *Redressability*

Finally, attacking the redressability of Plaintiff's alleged injury, Aurora suggests that it might have alternative means of exporting its water out of the Arkansas River basin if the Contract were invalidated.  (*See, e.g.*, Aurora's Reply at 12 n.5.)  I find Aurora's mere allusion to the possibility of alternate means of exporting its water insufficient to defeat the allegations of causation, and hence of redressability, in Plaintiff's amended complaint.  As noted above, Plaintiff has adequately alleged that the Contract is a "but for" cause of the export of Aurora's water out of the Arkansas River basin, and has moreover buttressed this allegation with proffered state water court decrees requiring Aurora to enter into storage and exchange contracts with the United States prior to executing the physical exchanges between Fry-Ark Project facilities adjudicated in these decrees.  (*See* Pl.'s Resp. at 16–18, Ex. 4 [2004 Decree], Ex. 6 [1994 Decree].)  Accordingly, I find Aurora's vague allusion to alternative means of exporting its water insufficient to overcome the contrary allegations of "but for" causation between the Contract and

Plaintiff's export of water in the amended complaint. Moreover, even assuming Aurora were able to export its water out of the Arkansas River basin if I declared the contract invalid, this ability would still not preclude my instant finding of redressability because invalidating the Contract would still alleviate Plaintiff's alleged economic injuries at least until Aurora obtains new state water court decrees or builds new storage facilities to facilitate the exchange and export of its water out of the Arkansas River basin. *See Nova Health Sys.*, 416 F.3d at 1158 (stating that, to satisfy redressability, a judgment must "relieve a discrete injury, although it need not relieve . . . every injury").

Based on the foregoing, I find that Plaintiff has standing to assert claims based upon injuries to both its alleged direct and associational interests in Fry-Ark Project and Arkansas River water. Moreover, because Plaintiff's alleged associational injuries — *i.e.*, a decrease in economic activity in the Lower District, and a diminution of the tax base potential of this district — would apply with equal force to both Plaintiff itself and its constituent members and water users, I need not consider Aurora's argument pertaining to whether Plaintiff has "organizational standing" to sue solely on behalf of its members. (*See* Aurora's Br. at 9–12; *see also* Am. Compl. ¶ 49 [stating that a diminution of the tax base potential of the Lower District would directly decrease Plaintiff's tax revenue].)

Having resolved the threshold issue of constitutional standing, I proceed to the Defendants' specific challenges to each of Plaintiff's claims.

***b.***     ***Plaintiff's First Claim for Relief***

Plaintiff's first claim for relief seeks a declaratory judgment that the Contract is not authorized by the Reclamation Act of 1902, the Frying-Pan Arkansas Authorization Act, or any other law. (Am Compl. ¶¶ 82–84.) Defendants object that Plaintiff lacks prudential standing to bring this claim because its alleged interests are not arguably within the "zone of interests" created by these Acts. (United States' Br. at 22–24; Aurora's Reply at 11–13.) For the following reasons, I disagree.

The "most widely-cited discussion of the zone of interest test is set forth in *Clarke v. Sec[urities] Industry Association*," in which the Supreme Court stated:

> The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

479 U.S. 388, at 399–400 (1987); *Gilda Indus., Inc. v. United States*, 556 F. Supp. 2d 1366, 1370 (D.D.C. 2008). In applying the "zone of interests" test, courts do not ask whether, in enacting the statute in question, Congress intended to benefit the plaintiff. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998). Instead, courts "first discern the interests 'arguably . . . to be protected' by the statutory provision at issue," and then "inquire whether the plaintiff's interests affected by the agency action in question are among them." *Id.* The ultimate

question is whether the interests sought to be protected by the plaintiff are "arguably within the zone of interests to be protected by the statute . . . in question." *Clarke*, 479 U.S. at 395.

In the instant case, Plaintiff alleges that the Frying-Pan Arkansas Authorization Act required the Untied States to operate the Fry-Ark Project in accordance with various legislative documents explicitly incorporated into the Act, including certain "operating principles" that require the project "'be operated in such a manner as to secure the greatest benefit for the use and reuse of imported project waters within project boundaries.'" (Am. Compl. ¶ 34 [quoting "House Document 140, Eight-seventh Congress"].) Plaintiff moreover alleges that, pursuant to these legislative documents, "the authorized purpose of the Fry-Ark Project is to import water into the Arkansas River basin for agricultural, domestic, municipal, and industrial purposes for use within the natural drainage basin of the Arkansas River." (*Id.* ¶ 36.) In its motion to dismiss, the United States claims that Plaintiff's injuries do not fall within the "zone of interests" protected by the Frying-Pan Arkansas Authorization Act and its related legislative documents because this Act and these documents contemplate the beneficial use of Fry-Ark Project water alone within project boundaries, and Plaintiff objects to Aurora's export of non-project water out of the Arkansas River basin. (United States' Br. at 22–24.) In response, Plaintiff contends that the United States' reading of the Frying-Pan Arkansas Authorization Act and its related legislative documents is too circumscribed, and that "use of project facilities to remove water from the Arkansas River (even Non-project Water) is antithetical to the purpose of operating the project to provide more water [to the Arkansas River basin]." (Pl.'s Resp. at 27.)

I find that "the interests 'arguably . . . to be protected' by" the Frying-Pan Arkansas Authorization Act and its related legislative documents include the maximization of Arkansas River water in the Arkansas River basin, and that Plaintiff's alleged direct and associational interests relating to Fry-Ark Project and Arkansas River water implicate this interest. *Nat'l Credit Union Admin.*, 522 U.S. at 492. More specifically, although neither party engaged in meaningful statutory exegesis, or presented relevant legislative history of the Frying-Pan Arkansas Authorization Act or its related legislative documents, I find that the bare allegations in Plaintiff's proffered amended complaint are sufficient to demonstrate that its claims are "arguably within the zone of interests to be protected by the statute . . . in question." *Clarke*, 479 U.S. at 395; *see also Lujan*, 504 U.S. at 561 (stating that in meeting its burden of proving subject matter jurisdiction, the plaintiff must support its assertions of subject matter jurisdiction "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation"). Plaintiff alleges that the purpose of the Frying-Pan Arkansas Authorization Act and its related legislative documents is to "import water into the Arkansas River basin for agricultural, domestic, municipal, and industrial purposes," and Plaintiff's single citation to supporting evidence for this assertion in its amended complaint arguably supports this assertion. (Am. Compl. ¶¶ 34, 36 [quoting "House Document 140, Eight-seventh Congress," which recites that the Fry-Ark Project must "be operated in such a manner as to secure the greatest benefit for the use and reuse of imported project waters within project boundaries"].) While this evidence might, as the United States argues, evince an exclusive Congressional intent to maximize the beneficial use of Fry-Ark Project water alone

within Fry-Ark Project boundaries, it might also, at least viewed in the light most favorable to Plaintiff, evince an implicit Congressional intent to maximize the absolute amount of water within these same boundaries. Aurora nearly concedes as much by stating that the Act "undeniably is operated to benefit the Arkansas [V]alley," (Aurora's Reply at 1, 17 [citation and internal quotation marks omitted]), and, as Plaintiff colorfully argues, accepting the United States' proffered contrary interpretation "would allow the United States to use the Project to export unlimited native water out of the Arkansas River basin, . . . . leav[ing] the Arkansas River basin with less water than it had before the Project[:] a paradoxical result . . . ." (Pl.'s Resp. at 6.) While resolving these competing interpretations of the Act would require me to reach the merits of Plaintiff's claim on inadequate briefing, I find that Plaintiff's alleged interests in Arkansas River water are at least not so "marginally related to or inconsistent with the purposes implicit in [the Frying-Pan Arkansas Authorization Act] that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399–400. Accordingly, I find the allegations in Plaintiff's complaint satisfy the "zone of interest" test, and that this test poses no impediment to my exercise of jurisdiction at this stage of the litigation.

### c.  *Plaintiff's Second Claim for Relief*

Plaintiff's second claim for relief seeks a declaratory judgment that, in entering into the Contract, the United States violated the Water Supply Act of 1958 which requires Congressional approval of modifications to a reservoir project to include storage for municipal purposes "which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes." (Am. Compl. ¶ 86

[quoting 43 U.S.C. § 390b(d)].) The United States objects that Plaintiff lacks prudential standing to bring this claim, and that it has failed to state a claim upon which relief may be granted. (United States' Br. at 24–25, 28.) Aurora broadly joins in these objections. (*See* Aurora's Reply at 17–18, 27.) I assess each issue in turn.

### i.    Prudential Standing

The Water Supply Act of 1958 recites that "[i]t is declared to be the policy of the Congress to recognize the responsibility of" state and local governments to develop their own water supplies and "that the Federal Government should participate and cooperate with the States and local interests in developing such water supplies . . . ." 42 U.S.C. § 390b(a) (2006). The Act authorizes the United States to include storage in any reservoir project for "any future demand or need for municipal . . . water" so long as the cost of construction or modification of the reservoir project is shared between the beneficiaries. *Id.* § 390b(b). Nonetheless, the Act provides that:

> Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law.

*Id.* § 390b(d).

The United States argues that the "zone of interest" of this statute "is concerned with the regulation of repayment of project construction or modification costs in situations in which the United States cooperates with local or state entities to develop water supplies," and that Plaintiff's alleged interests in Arkansas River and Fry-Ark Project water are "utterly unrelated to [such]

financial relationships."  (United States' Br. at 24–25.)  In response, Plaintiff argues that the Act's

"zone of interest" includes "storing water for municipal and industrial storage, and preventing

changes that would 'seriously affect' a Bureau of Reclamation project or involve 'major structural

or operational changes,' unless authorized by Congress."  (Pl.'s Resp. at 28–29.)  For the

following reasons, I agree with Plaintiff.

I find that the interests 'arguably . . . to be protected' by" the Water Supply Act of 1958

include the prevention of modifications to reservoir projects without Congressional approval to

provide municipal storage where such modifications would "seriously affect the purposes for

which the project[s] [were] authorized" or "involve major structural or operational changes."  42

U.S.C. § 390b(d) (2006).  This "arguably" protected interest appears on the face of the Act, and at

least one circuit court has implicitly found it to be protected by holding that a challenge to the

United States' modification of a reservoir project on the grounds that this modification constituted

a major operational change without Congressional approval "come[s] within the zone of interests

that Congress could reasonably have intended to protect."  *Se. Fed. Power Customers, Inc. v.*

*Geren*, 514 F.3d 1316, 1323 (D.C. Cir. 2008).  In its reply brief, the United States essentially

concedes that such an interest arguably falls within the "zone of interests" protected by the Act,

but nonetheless contends that Plaintiff's interests allegedly affected by the Contract do not

implicate modifications to the Fry-Ark Project affecting the project's purpose or constituting a

major structural or operational change to the project, because these interests relate to the export of

Aurora's non-project water out of the Arkansas River basin.  (United States' Reply at 13–14.)

Aurora essentially argues the same thing.  (Aurora's Reply at 17–18.)  While I agree that

Plaintiff's alleged interests relate to the export of non-project water out of the Arkansas River basin, I disagree that this fact proves that Plaintiff's alleged interest do not implicate modifications of the Fry-Ark Project affecting the project's purpose or constituting a major structural or operational change. To reach such a conclusion, I would have reach the merits of the Plaintiff's first claim by determining the project's purposes, and thus whether use of project facilities to assist the export of non-project water would affect this purpose or constitute a "major . . . operational change[]" to the project. 42 U.S.C. § 390b(d) (2006). Nonetheless, because the "zone of interest" test is "not meant to be especially demanding" and requires no indication that "congressional purpose [is] to benefit the would-be plaintiff," I find that such an inquiry is both premature on the instant briefing and unnecessary, and accordingly find that Plaintiff's alleged interests arguably fall "within the zone of interests to be protected by" the Water Supply Act of 1958. *Clarke*, 479 U.S. at 399–400.

### ii. *Failure to State a Claim*

The United States additionally argues that Plaintiff failed to state a claim under the Water Supply Act of 1958 because it did not adequately allege that there has been construction of a new project or modification of an existing project. (United States' Br. at 28–29.) Instead, as the United States claims, the Contract "simply allows storage of non-Project water in unused, but already constructed, space in Pueblo Reservoir." (*Id.* at 28.) The United States additionally argues that the use of Fry-Ark Project facilities under storage and exchange contracts does not constitute an "operational change" to the project because the United States has issued such contracts for "[twenty]-plus years" to various entities. (*Id.* at 28 n.7.) Aurora, for its part, merely

conclusorily contends that Plaintiff has not adequately alleged "that the use of excessive reservoir storage space [under the Contract] is a 'modification' which would 'seriously affect the purposes for which the project was authorized." (Aurora's Reply at 27.) For the following reasons, I am not persuaded by Defendants' arguments.

First, despite the United States' intimation to the contrary, I find that the construction or modification of existing physical project facilities is not a prerequisite to the statement of a claim under the Water Supply Act of 1958. The Act itself requires Congressional approval of any "major . . . operational change" to a project, and multiple courts — including this one — have held that the reallocation of water to different uses than those originally permitted by a project's enacting legislation constitute "modification" of a reservoir project. *See, e.g.*, *Re Application of City and County of Denver*, 1989 WL 128576, at *5 (D. Colo. Oct. 23, 1989) (noting that an application to change a "water right to a different point of diversion, use and place of use" is "[b]y any definition . . . a major operational change that may only be made upon congressional approval"); *Geren*, 514 F.3d at 1324 (finding a contract reallocating part of the storage capacity of a reservoir for different uses to be a "major operational change"); *Town of Smyrna v. United States Army Corps of Eng'rs*, 517 F. Supp. 2d 1026, 1048 (M.D. Tenn. 2007) (noting that the requirements of the Water Supply Act "can be triggered by a modification of a water supply project . . . such as the reallocation of water supply storage"). I find by analogy to these cases that the reallocation of storage space in Fry-Ark Project facilities to aid the net export of non-project water out of the Arkansas River basin could also constitute a "major . . . operational change" to the project, assuming that such export is inconsistent with Congress's intent in

authorizing this project.  Moreover, I find the United States' contention that the issuance of yearly

storage and exchange contracts for "[twenty]-plus years" proves that the Contract does not

constitute an "operational change" presupposes the wrong baseline from which to assess

"change."  The D.C. Circuit recently held that operational change must be assessed "from when [a

project] began operation," and noted that using an intervening baseline established by interim

water use contracts would allow "a chain of logic that would effectively bypass section 301(d) of

the [Water Supply Act]."  *Geren*, 514 F.3d at 1324.  I agree, and find that the issuance of storage

and exchange contracts for "[twenty]-plus years" is irrelevant to the question of whether such

contracts, by facilitating the export of non-project water out of the Arkansas River basin, violated

the Water Supply Act by constituting a major operational change to the Fry-Ark Project without

Congressional approval.  Because answering this question will require an analysis of Congress's

intent in authorizing the Fry-Ark Project — the subject of Plaintiff's first claim for relief — I also

reject Aurora's contention that Plaintiff has not adequately alleged that the Contract's allocation

of storage space to Aurora "would 'seriously affect the purposes for which the [Fry-Ark] [P]roject

was authorized." (Aurora's Reply at 27.)

> **d.**      ***Plaintiff's Third Claim for Relief***

Plaintiff's third claim for relief alleges that the United States violated section 14 of the

Reclamation Project Act of 1939, which provides in pertinent part:

> The Secretary [of the Interior] is further authorized, for the purpose of orderly and
> economical construction or operation and maintenance of any project, to enter into
> such contracts for exchange or replacement of water, water rights, . . . or for the
> adjustment of water rights, as in his judgment are necessary and in the interests of
> the United States and the project.

43 U.S.C. § 389 (2006).  Specifically, Plaintiff contends that the Secretary violated this provision by entering into the Contract without making findings that the Contract serves the purpose of orderly and economical construction or operation of the Fry-Ark Project, or that it is necessary and in the interests of the United States and the Fry-Ark Project.  (Am. Compl. ¶¶ 93, 95.)  The United States and Aurora contend that Plaintiff lacks prudential standing to bring this claim, and that I lack subject matter jurisdiction over this claim because the Secretary's actions are unreviewable.  For the following reasons, I agree with Defendants' second argument, and decline to consider their first.  (United States' Br. at 14–20, 25–26; Aurora's Reply at 17–18, 23–27.)

Although section 702 of the Administrative Procedures Act ("APA") makes agency actions presumptively reviewable, the APA also withdraws this presumption when the relevant statute "is committed to agency discretion by law."  *See* 5 U.S.C. §§ 701(a)(2), 702 (2006); *see also High Country Citizens Alliance v. Clarke*, 454 F.3d 1177, 1181 (10th Cir. 2006).  This exception to the APA's presumption of reviewability applies "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."  *Am. Bank, N.A. v. Clarke*, 933 F.2d 899, 902 (10th Cir. 1991) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 [further citations and internal quotation marks omitted].)  More specifically, this exception applies where a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Although Tenth Circuit precedent is slightly unclear, this precedent appears to hold that a defendant may prove that an agency action is committed "to agency discretion by law" by either demonstrating there is no law to apply, or that other factors

— such as the structure of the legislative scheme, its objectives, and the nature of the administration action involved — demonstrates that judicial review is precluded. *See Colo. Envtl. Coal v. Wenker*, 353 F.3d 1221, 1228 (10th Cir. 2004) (stating that the section 702[a][2] exception "is not limited to ***only*** those cases in which enabling legislation is drawn so broadly there is no law to apply," and reciting, based on Supreme Court precedent construing when judicial review is precluded under section 702[a][1], that the above-cited factors may also be considered [citations and internal quotation marks omitted] [emphasis in original]).

I find that section 14 of the Reclamation Project Act of 1939 is unreviewable under the APA because it is drawn so that I would have no meaningful standard against which to judge the Secretary's exercise of discretion. *Heckler*, 470 U.S. at 830. Upon its face, the statute merely allows the Secretary to enter into various contracts relating to water rights "*as in his judgment* are necessary and in the interests of the United States and the project." 43 U.S.C. § 389 (2006) (emphasis added). The statute provides no limitation upon the Secretary's exercise of judgment, and Plaintiff has pointed to no implementing regulations that cabin his discretion in exercising this judgement. *Cf. Colo. Envtl. Coal*, 353 F.3d at 1229 (looking to agency regulations for legal standard where controlling statutes "are silent" on the standard to apply in reviewing the agency's action). Similarly, the statute's recitation that the Secretary's discretion is necessary "for the purpose of orderly and economical construction or operation and maintenance of any project" constitutes mere precatory language that provides neither a legal standard by which to judge his actions, nor requires him to make factual findings. The Supreme Court has found agency action unreviewable under similarly deferential statutes, and I find by analogy to such statutes that

section 14 is unreviewable because it provides "no law to apply." *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 600 (1998) (finding a statute permitting the termination of an employee when the Director of the Central Intelligence Agency "shall *deem* such termination necessary or advisable in the interests of the United States" unreviewable because the statute does not permit termination "when the dismissal *is* necessary or advisable to those interests" [emphasis in original].)

In arguing against the above conclusion, Plaintiff advances two arguments that I must address. First, Plaintiff purports to invoke legislative history demonstrating that the Secretary was not intended to have broad discretion in entering into exchange contracts. (Pl.'s Resp. at 37–39.) I find such legislative history unconvincing because it fails to establish the proposition Plaintiff asserts, and irrelevant because Plaintiff still does not identify — either through this history or otherwise — any law I could apply in assessing the Secretary's exercise of judgment in entering into contracts pertaining to water rights. (*See id.* [reciting that "the only specific mention of (s)ection 14 in the legislative record . . . states '(t)he provisions of (s)ections (ten) to (fourteen), inclusive, would permit more economical and orderly construction and operation and maintenance of the reclamation projects than is possible under existing laws'"].) Second, Plaintiff seeks to analogize section 14 of the Water Supply Act to section 39 in the Mineral Leasing Act, suggesting that the Secretary's actions in the instant case are reviewable under section 14 because the Tenth Circuit has reviewed an alleged agency violation of section 39 of the Mineral Leasing Act. (*Id.* at 35–37 [discussing *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir. 1997)].) Putting aside the question of how similar or dissimilar section 14 of the Water Supply Act may be from section 39 of the Mineral Leasing Act, the case Plaintiff invokes never discusses the

reviewability of section 39, apparently because the parties failed to raise the issue.  *See Hoyl*, 129

F.3d at 1382 ("Although Plaintiff and the government allude to the [APA] in their briefs, neither

party attempts to guide the Court through its strictures.").  Accordingly, the mere fact that the

Tenth Circuit reviewed section 39 of the Mineral Leasing Act establishes no precedent that this

Act is reviewable, and thus no persuasive authority that section 14 of the Water Supply Act may

also be reviewable by analogy.  More importantly, in reviewing agency action under section 39 of

the Mineral Leasing Act, the Tenth Circuit invoked case law construing that Act's provisions,

which, in turn, invoked various regulations enforcing the Act.  *See id.* at 1383–84 (citing *Copper

Valley Machine Works, Inc. v. Andrus*, 653 F.2d 595 [D.C. Cir. 1981] [further citations omitted].)

Consequently, to the extent that *Hoyl* contains any "implicit" holdings about the reviewabiltiy of

section 39 of the Mineral Leasing Act — and thus, by analogy, about the reviewability section 14

of the Water Supply Act — it "implicitly" holds only that section 39 is reviewable because there

was law to apply in reviewing it.  Plaintiff has cited no such law in the instant case.

> ### e.        *Plaintiff's Fourth Claim for Relief*

Plaintiff's fourth claim for relief — which subsumes its original fifth claim for relief

asserting a violation of an executive order — alleges that the United States violated various

provisions of NEPA by, *inter alia*, failing to prepare an Environmental Impact Statement, failing

to consider various effects of the Contract in its Environmental Assessment, and issuing a Finding

of No Significant Impact on the basis of inadequate analysis.  (Am. Compl. ¶¶ 98–104.)  In

response, Defendants contend that Plaintiff lacks prudential standing to bring this claim because

its alleged injuries are not within the "zone of interest" protected by NEPA. (United States' Br. at 26–27; Aurora's Reply at 18–20.) For the following reasons, I agree with Defendants.

It is well established that purely economic injuries do not fall within the "zone of interest" protected by NEPA. *See, e.g.*, *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("[W]e have consistently held that purely economic interests do not fall within NEPA's zone of interests."); *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (stating that "[t]he purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions[,]" and citing multiple circuit court cases so holding). In the instant case, Plaintiff's alleged direct and associational injuries all implicate economic, rather than environmental, concerns. (*See* Am. Compl. ¶¶ 47–51.) Specifically, Plaintiff alleges that: (1) if the Contract were invalidated, Aurora would allow Lower District water users to use its non-project water "to irrigate land for agricultural production," or, alternatively, would permit junior water rights holders to access more water "for economic activities such as irrigation and other purposes;" (2) the Contract facilitates the transfer of water away from historically irrigated land with a resultant "reduction in economic activity in the Lower [] Valley" and a decrease in available tax revenue to Plaintiff and other entities; and (3) the Contract impairs Plaintiff's ability to lease water to other entities. (*Id.*) I find that none of these alleged injuries are environmental, and thus that none fall within the "zone of interest" protected by NEPA.

In arguing against the above conclusion, Plaintiff essentially concedes that all its alleged injuries are economic, but nonetheless insists that all these injuries derive from the export of

water out of the Arkansas River basin, and that "it is beyond question that water is part of the physical environment." (Pl.'s Resp. at 30.) While I agree that water is part of the physical environment, I disagree that this fact has any relevance given Plaintiff's failure to allege any environmental injuries. For instance, in *Ashley Creek Phosphate Company*, the Ninth Circuit found that a plaintiff company that held phosphate reserves lacked prudential standing to bring a NEPA action aimed at invalidating an agency action that could facilitate greater phosphate mining operations in competition with the plaintiff's own phosphate mining operation because NEPA does not protect purely environmental injuries. 420 F.3d 934. The Ninth Circuit so held even though phosphate is also "beyond question . . . part of the physical environment." (Pl.'s Resp. at 30.) Put simply, Plaintiff's contention that injuries based on changes to the physical environment constitute "environmental injuries" is illogical and inconsistent with case law. Similarly, Plaintiff's invocation of case law discussing when changes to the "human environment" must be addressed in Environment Impact Statements is irrelevant to the question of whether, in its amended complaint, Plaintiff alleged any environmental injuries. (*See id.* at 30–31.) Finally, I find Plaintiff's invocation of its representations in its complaint that water users and other constituents in the Lower District realize environmental benefits from Arkansas River water including (1) living in socially diverse rural agricultural communities, (2) enjoying the aesthetics of Arkansas River water, and (3) engaging in water-related recreational activities, irrelevant in light of Plaintiff's failure to allege that any these benefits are impaired by the export of Aurora's non-project out of the Arkansas River basin. (*See id.*, at 31; Am. Compl. ¶¶ 15, 47–51.)

*3.*     *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.      DEFENDANT UNITED STATES' motion (#33) to dismiss is GRANTED in part and DENIED in part.

2.      DEFENDANT AURORA'S motion (#31) to dismiss is GRANTED in part and DENIED in part.

3.      Both DEFENDANTS' motions are granted with respect to Plaintiff's third and fourth claims for relief, but are otherwise denied.

4.      Any final judgment entered at the conclusion of the case shall reflect a judgment in favor of Defendants and against Plaintiff, dismissing Plaintiff's third and fourth claims for relief with prejudice.

Dated this 25th day of September, 2008.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge